**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **DEBRA K. KING,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION 09-0503-WS-C** |
| ) | |
| **ALABAMA DEPARTMENT OF** ) | |
| **PUBLIC HEALTH,** ) | |
| ) | |
| **Defendant.** ) | |

**ORDER**

This matter comes before the Court on defendant's Motion for Summary Judgment (doc. 43). The Motion has been briefed and is ripe for disposition.[1]

**I.      Nature of the Case.**

Plaintiff, Debra K. King, is a black female who filed a Complaint (doc. 1) against her former employer, the Alabama Department of Public Health ("ADPH"), in this District Court on

---

[1]      Several related motions are also ripe. In particular, defendant has filed a pair of Motions to Strike (docs. 55 & 56) taking issue with literally dozens of factual representations in plaintiff's brief and supporting affidavits. Rather than becoming mired in ancillary evidentiary objections at the outset, the Court will consider those Motions to Strike on an ongoing basis herein, and only to the extent necessary to resolve the pending Motion for Summary Judgment. Also, contemporaneously with its Motion for Summary Judgment, defendant filed a Motion to Exceed Page Limit (doc. 42). In this Court's experience, the 30-page cap on principal briefs imposed by Local Rule 7.1(a) is sufficient in all but the most complex or extraordinary cases. After careful review of the parties' filings (including defendant's 43-page principal brief and plaintiff's combined 70-page principal brief spread across two documents (docs. 53 & 54) without leave of court), the Court is hard-pressed to understand why briefing could not have been completed within the spatial constraints of Local Rule 7.1(a). What we have here is essentially a single-issue Title VII case that is unremarkable in factual or legal sophistication relative to other Title VII actions routinely litigated in this District Court within the Local Rule 7.1(a) parameters. Nonetheless, in its discretion, and to spare the parties the expense and delay of resubmitting their briefs, the Court **grants** defendant's Motion to Exceed Page Limit (doc. 42) and will also consider plaintiff's submission as filed, notwithstanding her noncompliance with the Local Rules and her attempted circumvention of applicable page limitations by splitting the fact and law sections of her brief into two different documents.

August 5, 2009.  The straightforward Complaint alleged causes of action against ADPH for race discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*  The gravamen of the Complaint is King's contention that ADPH engaged in "file papering" activities to fabricate disciplinary infractions against her and singled her out for adverse treatment after she accused her supervisors of plotting to eliminate all black employees from her workplace.  According to the Complaint, ADPH relied on bogus violations to terminate King's employment because of her race and in retaliation for her protected activity.

## II.    Background Facts.[2]

### A.    *Plaintiff's Employment History at ADPH.*

King is a Registered Nurse who began working for ADPH at the Conecuh County Health Department in 1992.  (King Decl., at 1.)[3]  During all times relevant to this lawsuit, her job title was Nurse Coordinator.  (*Id.* at 1-2.)  In that capacity, King's duties included supervising the administration of clinic services, ensuring staff compliance with prescribed standards and state policies, and providing direct nursing care.  (Doc. 54, ¶ 9.)  The Conecuh clinic to which King was assigned was a small clinic, staffed at all relevant times by a full-time Nurse Coordinator (King), a Social Worker, a Nurse Practitioner who visited the clinic from time to time, and a pair

---

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

[3]    Plaintiff's primary summary judgment exhibit is the 26-page Declaration of Plaintiff Debra King (doc. 53-1).  Unfortunately, plaintiff neglected to number the paragraphs (or even the pages, for that matter) of her Declaration.  This form of declaration needlessly complicates the Court's efforts to review and cite to that document.  To make matters worse, plaintiff omitted pinpoint citations to that Declaration in her briefing, instead offering a generic assertion that, "[u]nless stated otherwise, all facts are from the declaration of King."  (Doc. 53, at 3 n.1.)  It is improper for a litigant to shift to the Court the time-consuming burden of sifting through a lengthy, lawyer-drafted exhibit in search of a page, paragraph or sentence that supports that litigant's position on each of myriad factual issues, yet that is precisely what plaintiff has done.  The Court expects counsel to adhere to Local Rule 7.2(b) (requiring a party opposing a Rule 56 motion to "point out the disputed facts appropriately referenced to the supporting document or documents filed in the action") in future practice in this District Court.  It is not the Court's responsibility to scour the record in search of evidence that supports a litigant's position; rather, it is the litigant's responsibility to apprise the Court of precisely where in the record such evidence might be located.

of Administrative Support Assistants. (*Id.*, ¶ 8.) Until February 2008, King's employment at the Conecuh clinic was mostly uneventful, as she consistently received favorable performance evaluations and maintained a clean disciplinary record. (King Decl., at 4.)

**B. The March 28 Meeting and Plaintiff's Race Discrimination Complaint.**

Our story begins in earnest on March 28, 2008, when Debbie Thomasson (King's immediate supervisor) and Ricky Elliott (King's reviewing supervisor) conducted a meeting with King concerning Conecuh clinic operations. (Thomasson Aff., ¶ 6.) King admits that, at that meeting, she was told that she was "in charge" of the clinic and that "some changes needed to be made because it was not being ran [*sic*] as it should." (Defendant's Exh. 13, at 1.)[4] Among the numerous operational and performance issues that Thomasson and Elliott addressed with King at that meeting were the following: (i) the need for King to make sure the reception area was kept organized; (ii) a complaint that King had refused to see patients after they arrived (albeit late) for appointments that had previously been rescheduled three times, even though she was in the building; (iii) issues concerning King's attendance and multiple reports that she was not at work during normal business hours; (iv) at least two other patient complaints involving specific acts and omissions by King; (v) the front door being locked and no employees being present on certain mornings during scheduled business hours; (vi) the supervisors' assessment that "for the past year things have not been going well" at the clinic and that King's "evaluations would

---

[4]    This exhibit is a lengthy (and alternately defensive and combative) e-mail message authored by King, dated March 31, 2008, and transmitted to various ADPH supervisors, including both Thomasson and Elliott. The exhibit purports to be, in the words of plaintiff's counsel, an "e-mail confirming what had occurred during the meeting of March 28." (Doc. 54, at 20.) As such, this e-mail reflects the events of that meeting in the light most favorable to King because it is her own version of what transpired. The Court will not credit King's subsequent declaration or briefing to the extent they conflict with, disregard, or attempt to rewrite her March 31 summary of that meeting in a manner more favorable to King's present litigation status. A plaintiff cannot toggle back and forth between multiple inconsistent stories of her own creation to evade summary judgment by stitching together a hybrid version that picks and chooses the details from her own various narratives that are most advantageous to her. *See generally Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005) ("when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*. Our duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part: the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided."). The March 31 e-mail reflects King's account – in her own words – of the March 28 meeting; therefore, she must live with it on summary judgment.

reflect [her] responsibilities in Clinic" going forward; and (vii) interpersonal issues and disagreements between King and other employees. (*Id.* at 1-3.) From the breadth and scope of the issues raised, it was evident that ADPH viewed King as being on shaky ground as of March 28, notwithstanding her history of favorable performance evaluations.

On March 31, 2008, three days after the meeting, King sent an e-mail message to Thomasson, Elliott, and Ruth Underwood (highest ranking administrator for the Conecuh County Health Department) concerning the March 28 meeting. At the conclusion of that e-mail, King pointedly accused her ADPH supervisors of race discrimination. She indicated that she had heard complaints that "those White folks are going to get rid of you all" and "were going to pick yall [*sic*] off." (*Id.* at 4.) King further wrote: "I know what is going on here. You do plan to harrass [*sic*] us out of here one by one. It was ok for us to work in the decrepit building down the hill but, we Black folks don't need to be in this new building[.] … A copy of this letter and other letters from Black workers in Area 7 and 9 will be forwarded to the EEOC for review." (*Id.*)[5] King's missive referenced no specific facts or circumstances to buttress her accusation that ADPH officials were eliminating all black employees from the Conecuh clinic.

Upon receipt of King's e-mail, Thomasson called her immediately. (Thomasson Dep., at 58-59.) Thomasson admits that she was "upset," (*Id.* at 55-56.)[6] At that time, Thomasson asked King if she really felt that way. When King answered affirmatively, Thomasson responded, "okay, if that's the way you feel about it." (King Decl., at 15.) During that same conversation, Thomasson notified King of her right to file a grievance with ADPH on the matter. (Thomasson Dep., at 59-60.)[7] Underwood also contacted King shortly after receiving the March 31 e-mail, and made arrangements to meet with her to discuss it; however, because of various conflicts,

---

[5]     The reference to the "new building" alludes to the relocation of the Conecuh County Health Department to a newly completed structure in December 2007. (Doc. 54, at 10.)

[6]     This emotional reaction is hardly surprising, given that Thomasson construed King's e-mail as accusing her of being a racist. Of course, the mere fact that Thomasson was not pleased by King's inflammatory accusations does not necessarily imply that Thomasson retaliated against her for articulating those concerns.

[7]     When plaintiff's counsel asked her why she had done that, Thomasson explained that "as a supervisor, my job is to apprise the employee of their rights if they have a grievance." (*Id.* at 60.)

they were unable to schedule such a meeting until more than a month later, on May 8, 2008. (Underwood Aff., ¶ 18; King Decl., at 15.)  As discussed below, the May 8 meeting occurred as planned, but its agenda was altered considerably by certain intervening developments.

### C.  Performance Issues in April and May 2008.

In the wake of the March 28 meeting, ADPH officials identified a series of additional performance-related issues with the Conecuh clinic generally, and with King specifically.[8]  The three most significant concerns that arose were (a) information that King had falsified clinic records; (b) information that King had allowed the clinic's drug inventory control book to go missing, failed to report its absence, and obtained assistance from a housekeeper or janitor to reconstruct it; and (c) other information that King had engaged in dishonest or otherwise improper conduct in performing her Nurse Coordinator duties.  There is record evidence as to each of these issues.

### 1.  Falsification of WIC Records.

Among the programs that ADPH administers is the federal Women, Infants, Children Supplemental Food Program (the "WIC Program").  (Underwood Aff., ¶¶ 8-9.)  The WIC Program provides supplemental foods and other benefits to eligible participants (pregnant and postpartum women, infants and young children), subject to a requirement that participants must receive nutrition education.  (*Id.*, ¶ 9.)  This nutrition education is provided in two phases, the first being when the participant is accepted into the program and the second (so-called secondary

---

[8]     Plaintiff suggests that ADPH engaged in a pretextual fishing expedition after the March 31 e-mail to identify shortcomings with her performance.  In support of this claim, King states in her declaration that, when she was on sick leave, somebody called somebody else and said that Underwood and Thomasson "were at the clinic pulling records and being very 'hush hush' about it," after which the second person called King to relay that information.  (King Decl., at 15.)  Defendant has properly objected to this evidence as hearsay on top of hearsay.  (Doc. 56, at 3.)  "The general rule in this Circuit is that parties' exhibits may be considered for purposes of pretrial rulings so long as they can be reduced to admissible form at trial."  *Longcrier v. HL-A Co.*, 595 F. Supp.2d 1218, 1223 (S.D. Ala. 2008) (citations omitted).  But King has made no showing that her double-hearsay testimony about what someone told her that someone else had said about Underwood and Thomasson's activities could be reduced to admissible form at trial; therefore, this evidence will not be considered on summary judgment.  Defendants' Motions to Strike (docs. 55, 56) are **granted** insofar as they seek exclusion of these materials from the record.

nutrition education ("SNE")) in follow-up visits.  (*Id.*)  At the Conecuh clinic, King was the WIC Coordinator and was the only employee authorized to conduct SNE.  (Doc. 54, ¶ 32.)

On April 22, 2008, Nancy Johnson (the ADPH's Area Nutrition Director with oversight responsibility for the Conecuh clinic) visited the Conecuh clinic to perform duties concerning the WIC Program.  (Johnson Aff., ¶ 3.)  At that time, Johnson noticed clinic records stating that on April 16, 2008 King had completed 12 SNE individual visits, as well as an SNE class with 10 participants.  These records concerned Johnson for two reasons.  (*Id.*)  First, Johnson knew for a fact that King had been out of the office on April 16, because King had attended a WIC Coordinators' meeting in Monroeville, Alabama with Johnson that day.  (*Id.*, ¶ 2.)  Second, all 10 names of the SNE class participants were also included in the 12 names of people for whom King had purportedly completed individual visits on the same day.  (*Id.*, ¶ 3.)  So the Conecuh clinic's official records showed that King had provided duplicate SNE services for the same ten people twice on April 16, a day on which she had not even been present at the clinic.  Johnson became alarmed that such conduct amounted to duplication of services, falsification of records, and violation of federal WIC Program guidelines that ADPH was bound to follow as a condition of its participation.  (*Id.*)

Johnson promptly questioned King about these discrepancies.  (*Id.*, ¶ 4; King Decl., at 16-17.)  Plaintiff's evidence is that, in response, King admitted that she had been in Monroeville on the day these SNE individual visits and class meeting purportedly occurred, and explained that she had just had clerks give the participants pamphlets for SNE credit.  (King Decl., at 16-17.)[9]  King further informed Johnson that all she (King) had to do was sign and backdate the WIC "green cards" (index cards for each participant tracking appointments, food vouchers, and SNE participation) for that day, which she had not yet done.  (*Id.* at 17.)  When Johnson indicated that this was improper, King was unrepentant, replying that "it had been done this way for years and that Johnson knew it."  (*Id.*)  According to King, she had been completing WIC green cards for approximately the last four years to certify that she had conducted SNE contacts

[9]     It is undisputed that applicable written policy provides that "[t]he use of publications … without the other elements of nutrition education is not considered to be effective and will not be counted as a nutrition education contact."  (Thames Peoples Dep., at 11; King Dep., at 97 & Exh. 21, at 2.)  Thus, ADPH workers could not simply hand WIC participants a pamphlet and record that contact as an SNE.  Yet that is precisely what King did.

that had never actually happened, even though "[n]obody had told [her] it was okay to proceed in that fashion." (King Dep., at 85-86; Johnson Aff., ¶ 8.)[10]  In fact, King admits that Johnson told her in April 2008 that King's practice concerning WIC green cards and SNE certification was "fraud." (King Dep., at 101.)

The day after Johnson's inquiry, however, King went back into ADPH's computer system and altered the SNE records for April 16 to delete the double-counting of SNE individual and class sessions for 9 of the 10 participants listed for the April 16 class that had never happened, and to change the records for the April 16 appointments that had never happened to "pickup" instead. (Johnson Aff., ¶ 5 & att. 2.)  In other words, despite her insistence that she had done nothing wrong, the next day after Johnson confronted her, King took affirmative steps to erase the discrepancies in ADPH records of SNE sessions on April 16.

Johnson sent a follow-up e-mail to King on April 24 seeking further investigation and clarification about the April 16 SNEs and how this policy violation could have happened and whether it had occurred on other occasions; however, King never responded. (Johnson Aff., ¶ 5 & att. 1.)  On that basis, and given that King had covered her tracks in the computer on April 23, Johnson conducted further investigation as to whether there was a pattern of documenting SNEs for WIC participants when King was not present at the clinic. (Johnson Aff., ¶ 6.)  Johnson

---

[10]     Plaintiff offers no evidence that double-counting the act of handing a pamphlet to a WIC participant as both an SNE class and an individual SNE visit was ever an acceptable ADPH practice.  However, to justify her practice of handing out literature in lieu of a required face-to-face or computer-based SNE session, King submits testimony of Idell Thames Peoples, a former employee at ADPH's office in Atmore, Alabama, that Johnson had told her "years ago" to hand out pamphlets as an SNE when the nutritionist is not present. (Peoples Dep., at 7.)  This evidence is properly submitted and considered on summary judgment.

King also states in her declaration that a person named Yolanda Gantt told King something similar about practices in the ADPH's Brewton office. (King Decl., at 17-18.)  Defendant objects to King's hearsay statements about what Gantt may have told her. (Doc. 55, at 8.)  The Court agrees that plaintiff has not shown that this evidence may be reduced to admissible form at trial, particularly given that the plaintiff-submitted affidavit from Gantt (doc. 54-2) omits the SNE testimony that King's declaration attributes to her.  The Court therefore will not consider the portion of pages 17 and 18 of King's declaration purporting to recite hearsay statements of Gantt that plaintiff has not shown can be reduced to admissible form at trial.  The same goes for King's unvarnished speculation about what she thinks Johnson knew about SNE practices at the Conecuh clinic and elsewhere, to which defendant has objected, where King's declaration identifies no viable evidentiary foundation for such conjecture.  Defendants' Motions to Strike (docs. 55, 56) are **granted** as to these items.

discovered that during the week of January 7-11, 2008, when King was attending a team academy in Montgomery, there were 24 documented SNE encounters at the Conecuh clinic, with all such SNEs having been initialed and dated by King on the participants' respective green cards, even though King was not there and could not possibly have administered such education. (*Id.*, ¶ 7 & att. 3.) Johnson documented her findings and submitted them to Underwood via written memo dated April 25, 2008. (*Id.*)

### 2. *The Drug Inventory Control Book.*

The Conecuh clinic maintains a Drug Inventory Control Book to track the stock of prescription drugs on hand and connect those inventories to the patients to whom they are prescribed. (Thomasson Dep., at 108.)[11] Simply put, "the drug book is the record. … It is the record of your stock. It has your tracing information for all the drugs that we receive. … The major concept is that it should never be away." (*Id.* at 111.)[12] Thomasson views the "continuity and the accountability of maintaining that stock … [as] a huge role of what a nurse coordinator does." (*Id.* at 108.) To Thomasson, "the coordinator has the all time accountability, always for the drug book." (*Id.* at 94.) For her part, King admits that she was responsible for maintaining possession of the drug inventory control book at the Conecuh clinic. (King Dep., at 107.) The

---

[11] King concedes that the drug book "is used primarily to keep track of various drugs we dispense to clients of the clinic, such as antibiotics, tuberculosis meds, STD meds, and birth control meds." (King Decl., at 5-6.) However, she insinuates that the drug book is no big deal because it "has no value to anyone outside the clinic" and because the clinic does not dispense "any kind of controlled substances typically sold illegally on the streets." (*Id.* at 6.) King also reasons that "[i]t would not have done me any good to have the Drug inventory book and no meds." (*Id.* at 20-21.) These rationalizations are undercut to a large extent by King's admissions that "this book is to be kept in a secure place" and "[i]t's common practice that you should know where the book is, yes." (King Dep., at 115-16.)

[12] John Hankins, the State Nursing Director, explains the utility of the book in the following terms: "An accurate Drug Inventory Control Book ensures that the nurse is aware of the amount of medication in the health department at all times and is able to ensure that diversion or theft does not occur." (Hankins Aff., ¶ 9.) Hankins further states that in order to comply with applicable federal guidelines, "Medications must be accounted for as they enter the system and are dispensed to the patient. … The importance of nursing protocol and the inventory procedures related to medication are elevated due to the level of independence under which public health nurses operate." (*Id.*) If these records are not properly maintained by ADPH clinics, the consequences could be an adverse audit and potential loss of funding for federal programs in which those clinics participate. (Thrash Aff., ¶ 7.)

drug book "is missing if it's not with the drugs … [a]nd whoever has it needs to get it back to the drugs." (Thomasson Dep., at 109.) Without the drug book, it is impossible to ascertain whether any drugs in the clinic's stock are missing. (*Id.* at 112.) If for any reason the drug book were to be misplaced, a nurse who discovered its absence was expected to report that fact, recreate the drug inventory on the proper form, and complete an incident report. (*Id.*)

On May 13, 2008, Thomasson went to the Conecuh clinic for the specific purpose of evaluating another employee (not King). While she was there, Thomasson went to the drug room to get a medication for a patient, but was unable to sign that medication out of the Drug Inventory Control Book because the book was not there. (Thomasson Aff., ¶ 8.) Thomasson immediately confronted King about the whereabouts of the book. King responded that she knew the book had been missing for about three weeks,[13] and that King had simply assumed that Thomasson or some other ADPH official had taken the book. (King Decl., at 5, 20; Thomasson Dep., at 108.)[14] King never reported the book as missing. (King Dep., at 131.) In Thomasson's view, King's knowledge of the book's absence for a period of weeks, and her failure to report that fact to anyone, constituted "a major breach of practice" and "a major wrongdoing for a nurse." (Thomasson Dep., at 108.) In her deposition, Thomasson steadfastly rejected plaintiff's counsel's premise that it was okay for King not to report that the drug book was missing because King assumed her supervisors had it. On that point, Thomasson stressed, "She should have reported it to me." (*Id.* at 109.) Moreover, Thomasson's testimony was unequivocal that King's oversights in this regard amounted to "major nursing infractions." (*Id.* at 112.)

To this day, the missing drug book has never been found, despite ADPH officials having performed an extensive search of the building. (Thomasson Dep., at 105.) Moreover, ADPH officials concluded that King compounded her error in not reporting the book's absence by not

---

[13]       Actually, it appears that King knew the book was missing for longer than that. In her deposition, King testified that the last time she saw the drug inventory book was in March 2008, and that she believes the book may have been taken then. (King Dep., at 110-12.) Thus, by King's own testimony, she had known the book was missing for as long as two months before Thomasson brought the matter to her attention.

[14]       There is no evidence that King took any action to investigate or confirm her assumption about the whereabouts of the book, or that she had any factual basis for believing that her supervisors had removed it from the premises for a prolonged period of time without telling King, the person charged with maintaining that book on site.

properly creating a new inventory list. Rather than printing off the readily available correct form[15] and recording drug quantities, dates, expirations and other information needed for an official ADPH drug inventory, King presented Thomasson with an undated handwritten document that Thomasson characterized as a "scribbled list, like you might make to go to the grocery store," and deemed "totally inadequate." (*Id.* at 113-14.)[16] By King's own admission, when she discovered that the inventory book was missing, she enlisted the aid of the clinic's "housekeeper" to help King with the inventory by writing down drug names as King called them out. (King Dep., at 119-20.) Again, King did all of this without consulting her supervisors, notifying them that the drug book was missing, or inquiring of them as to the proper steps for recreating a drug inventory. In Thomasson's view, these omissions constituted "major nursing infractions," so much so that Thomasson no longer entrusted King with drug responsibilities

---

[15]    ADPH utilizes a form entitled the "ADPH Medication Requisition/Inventory Form" recording detailed information for each drug on hand. (Thrash Aff., at att. 2.) The Drug Inventory Control Book is nothing more than a collection of these forms. (*Id.*, ¶ 2.) By simply printing out and completing these forms, King could have substantially recreated the missing drug book and mitigated the harm caused by its disappearance. Yet she failed to do so.

[16]    This new drug record consisted of four pages of scrawled handwritten listings of drugs, with quantity notations of varying degrees of helpfulness, all under the heading "Pharmacist List." (King Dep., at Exh. 22.) The list lacked information regarding drug concentrations and expiration dates, any indication as to the date the list was prepared, and notations about what drugs were signed out, when, and by whom. King misleadingly states that her new list gave "the lot numbers and other information that would have been noted on the DI sheets" (King Decl., at 22); however, a side-by-side comparison of the proper forms and King's recreated "Pharmacist List" reveals that King's document contained only a small fraction of the information that belonged on the inventory forms (and, for that matter, did not even contain lot numbers for many items). On summary judgment, King insists that she "was going to transfer the information to the drug inventory sheets and start a new book" (King Decl., at 22), but the fact is that she never did. (Besides, her suggestion that she intended to go through the effort of recreating detailed records contained in a drug book that she "assumed" her supervisors were reviewing, without ever inquiring of those supervisors as to the veracity of her assumption, borders on the nonsensical. Why would King do that much work in a resource-strapped health clinic to recreate records that she "assumed" her supervisors were reviewing, without first checking to see if they had those records and, if so, whether and when they might return them?) Thus, King allowed the Conecuh clinic to operate for a period of weeks with a missing drug book, without preparing proper inventory records for a new drug book (even though she knew this step needed to be taken), and without breathing a word of these troublesome matters to her supervisors.

after that time.  (Thomasson Dep., at 112-13.)  Thomasson reported these developments to Underwood.  (Thomasson Aff., ¶ 8.)

           3.        *Other Improper Conduct.*

Although the WIC records and drug book problems were ADPH's paramount concerns, other facts contributed to defendant's decision to take serious personnel action against King.

For example, ADPH officials believed that King was dishonest to them at a meeting held on May 8, 2010.  At that time, Underwood confronted King about a situation on March 18, when King had failed to meet with young patients who had appeared for an immunization appointment that had previously been rescheduled three times.  King said that she had been unable to see the children that day because she was teaching a breast feeding class at the Extension Office.  Upon being pressed by Underwood, however, King admitted that there had in fact been no breast feeding class scheduled on March 18 at the Extension Office.  (Underwood Aff., ¶ 24.)

Furthermore, after the Drug Inventory Control Book issue came to light, Thomasson and Underwood requested that the State Nursing Director, John Hankins, conduct an audit of the Conecuh clinic's operations.  (Thomasson Aff., ¶ 9; Underwood Aff., ¶ 27; Hankins Aff., ¶ 5; Thomasson Dep., at 107.)[17]  Hankins (who often audits ADPH clinics) performed an audit in late May 2008 by pulling a small, random sample of medical records of patients who had visited the clinic during the previous six months.  (Hankins Aff., ¶¶ 6-7.)  During the course of that audit, Hankins identified "numerous concerns as it relates to proper nursing practice in the medical records," including organizational problems, documentation problems, lack of referrals to nurse practitioners or physicians when protocol required them, and so on.  (*Id.*, ¶ 7.)  Hankins discovered "a large number of errors" with King's work, and also found that she was practicing medicine without a license by dispensing contraceptives to patients whose physical exams she was deferring.  (*Id.*, ¶ 8.)  For her part, King does not dispute most of these errors; however, she attributes Hankins' audit to a "mere fishing expedition looking for justification for termination"

---

[17]      Thomasson testified that the missing drug book issue was the "compelling thing" and the motivating force for her request that an audit of the Conecuh clinic be performed. (Thomasson Dep., at 108.)  Recall that in ADPH's view, King had lied, falsified records and used poor judgment, and that King was supposed to be running the clinic.  Based on these revelations, ADPH's confidence and trust in the performance of King and the Conecuh clinic had been shaken to the point where defendant believed that further investigation was necessary.

and indicates that none of the mistakes Hankins found "had caused any injury, damage or harm," such that they amounted to "nitpicking" and "piling on" by ADPH. (King Decl., at 22-25.) Thus, King espouses a "no harm, no foul" philosophy as to her nursing errors. ADPH did not share that view.

### D. Termination of Plaintiff's Employment.

In approximately mid-May 2008, Thomasson made a recommendation to the ADPH that King's employment be terminated. (Thomasson Dep., at 83.) Thomasson's reason for making that recommendation was her assessment that King had engaged in "major breaches in practice," including the drug book issues, the fraudulent WIC documentation, and issues of concern in patients' medical records about treatment. (*Id.* at 86.)[18] This recommendation was echoed by Elliott and Underwood.

ADPH placed King on mandatory administrative leave effective May 19, 2008. (Underwood Aff., ¶ 29; King Decl., at 26.) The stated purpose of this leave was "to finalize the investigation and give the employee her pre-termination conference." (Defendant's Exh. 26.) The leave period was extended on June 13, 2008, to allow for completion of the audit "that identified serious patient care issues" and to obtain "further information to ensure the correct decision is made." (*Id.*)

On June 19, 2008, the ADPH notified King in writing that her employment was being terminated, effective immediately, based on (a) the recommendation of Thomasson, Elliott, and Underwood, (b) the results of a pre-termination conference which yielded a recommendation that

---

[18]     Plaintiff presents allegations by King that Thomasson "was the one who wanted me gone and Underwood and Elliott went along with it by bringing in Hankens [*sic*] and his team to review all of my files until they felt that they had enough to justify the termination. … If Thomasson could have had it her way, she would have fired me the same day she read my e-mail complaint." (King Decl., at 26.) Similarly, King hypothesizes that when she was placed on administrative leave on May 19, "[t]he purpose of the leave was to remove me from the clinic while about five or six nurse educators and supervisors comb through my files looking for evidence of mistakes so as to justify the termination recommendation." (*Id.* at 13.) As plaintiff's counsel well knows, this kind of self-serving speculation about the mental processes of other persons is untethered to any record facts, is obviously improper for a summary judgment declaration, and is devoid of any evidentiary value. Accordingly, defendants' Motion to Strike (doc. 55) is **granted** as to these portions of the King Declaration.

King's termination be upheld, and (c) the state health officer's acceptance of that recommendation. (Defendant's Exh. 3.)

## III. Summary Judgment Standard.

Summary judgment should be granted only if "there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations." *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

The Eleventh Circuit has expressly rejected the notion that summary judgment should seldom be used in employment discrimination cases because they involve issues of motivation and intent. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004). Rather, "the summary judgment rule applies in job discrimination cases just as in other cases. No thumb is to be placed on either side of the scale." *Id.* at 1086 (citation omitted).

## IV. Analysis.

### A. *McDonnell Douglas Framework.*

The parties' respective summary judgment arguments on King's discrimination and retaliation claims are properly evaluated under the time-honored *McDonnell Douglas* standard. Absent direct evidence of discrimination or retaliation (which has not been presented here), King must make a showing of circumstantial evidence that satisfies the test set forth in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this familiar burden-shifting analysis, plaintiff is required to make out a *prima facie* case of race discrimination and/or retaliation.[19]  If she does so, that showing "creates a rebuttable presumption that the employer acted illegally."  *Underwood v. Perry County Com'n*, 431 F.3d 788, 794 (11ᵗʰ Cir. 2005).

At that point, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action. ... If the employer does this, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext for discrimination."  *Crawford v. Carroll*, 529 F.3d 961, 976 (11ᵗʰ Cir. 2008) (citations and internal quotation marks omitted); *see also Holifield v. Reno*, 115 F.3d 1555, 1566 (11ᵗʰ Cir. 1997) (outlining similar procedure for Title VII retaliation claims).  A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Brooks v. County Com'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11ᵗʰ Cir. 2006) (quotation omitted).  Either way, "[i]f the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. ... Quarreling with that reason is not sufficient."  *Wilson*, 376 F.3d at 1088; *see also Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1278 (11ᵗʰ Cir. 2008) ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason … was pretextual.").  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Springer v. Convergys Customer Management Group Inc.*, 509 F.3d 1344, 1347 (11ᵗʰ Cir. 2007).  Thus, "[i]f the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment."  *Chapman v. AI Transport*, 229 F.3d 1012, 1024-25 (11ᵗʰ Cir. 2000) (*en banc*).

---

[19]     King's burden of establishing a *prima facie* case is not heavy.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11ᵗʰ Cir. 2001) ("the *prima facie* requirement is not an onerous one").

## B.    Retaliation Cause of Action.[20]

In her Title VII retaliation claim, King alleges that ADPH's actions in terminating her employment after she complained of race discrimination in the workplace violate the anti-retaliation provisions of Title VII.  That statute renders it unlawful for an employer "to discriminate against any of his employees … because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).

### 1.    Prima Facie Case and Legitimate Nonretaliatory Reason.

To establish a *prima facie* case of retaliation under Title VII, King must show that "(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse employment action; and (3) [s]he established a causal link between the protected activity and the adverse action."  *Bryant v. Jones*, 575 F.3d 1281, 1307-08 (11th Cir. 2009); *see also Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1212-13 (11th Cir. 2008) ("To establish a claim of retaliation under Title VII or section 1981, a plaintiff must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events.") (citation omitted).  In its principal brief, ADPH eschews any contention that King cannot make a *prima facie* showing.  That decision was prudent, inasmuch as the record plainly establishes that each of these elements is satisfied.[21]

---

[20]    The Complaint asserts Title VII causes of action for both race discrimination and retaliation; however, the focal point of the parties' briefing (and the only claim as to which King has opposed entry of summary judgment) is the retaliation count.  For that reason, the Court's analysis will begin with that claim.

[21]    As to the first prong, it is well settled that a good-faith (even if not meritorious) internal complaint of race discrimination of the sort articulated by King constitutes protected activity under Title VII.  *See, e.g., Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1268 (11th Cir. 2010) (deeming plaintiff's letter to company official complaining of discrimination based on Cuban origin to be statutorily protected activity); *DeLeon v. ST Mobile Aerospace Engineering, Inc.*, 684 F. Supp.2d 1301, 1324 (S.D. Ala. 2010) ("Statutorily protected expression includes complaining to superiors about harassment in the work place, lodging complaints with the EEOC and participating in discrimination-based lawsuits.").  As to the second, the termination of King's employment is obviously a materially adverse action.  *See generally Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008) (to qualify as adverse action for Title VII retaliation purposes, "[t]he challenged action must be materially adverse from the standpoint of a reasonable employee"); *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000) (in Title VII retaliation context, adverse employment actions include ultimate employment decisions such as discharge or failure to hire).  And (Continued)

Moreover, there can be no dispute that ADPH has met its modest burden "to rebut the resulting presumption of discrimination by producing evidence that it acted for a legitimate, non-discriminatory reason." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010); *see also Vessels v. Atlanta Independent School System*, 408 F.3d 763, 769-70 (11th Cir. 2005) (employer's burden of production is "exceedingly light" and requires only that employer articulate "a clear and reasonably specific non-discriminatory basis for its actions") (citation omitted). After all, ADPH's evidence is that it terminated King because of an array of performance issues that undermined its confidence in her judgment, her ability to run the clinic, and her dealings with patients.

    2.    *Pretext.*

In light of the foregoing, ADPH's Motion for Summary Judgment as to the retaliation cause of action rises or falls with the pretext analysis. Defendant recognizes as much, arguing that "King's retaliation claim fails for lack of substantial evidence of pretext." (Doc. 44, at 42.) Simply put, it is incumbent on King to show that ADPH's stated reasons for her discharge are a pretext for retaliation. *See Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (once employer articulates reason, "the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason ... is a pretext for illegal discrimination") (citation omitted). To demonstrate pretext, the plaintiff's evidence "must reveal such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could

---

temporal proximity of roughly six weeks between King's protected activity and her forced administrative leave (which culminated in termination of her employment) is sufficiently close in time to satisfy the "causal link" requirement. *See, e.g., McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) ("close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated"); *Burroughs v. Smurfit Stone Container Corp.*, 506 F. Supp.2d 1002, 1018 (S.D. Ala. 2007) (causation element satisfied where plaintiff was terminated approximately six weeks after protected activity, and supervisor was aware of that protected activity upon recommending the adverse action). Based on the foregoing principles, and ADPH's failure to contest plaintiff's ability to establish a *prima facie* case of retaliation, the Court agrees that King has made a *prima facie* showing, and will move on to the next step in the *McDonnell Douglas* analysis.

find them unworthy of credence."  *Vessels*, 408 F.3d at 771 (quotation omitted).[22]  Significantly, King does not satisfy her burden unless she "proffer[s] sufficient evidence to create a genuine issue of material fact regarding whether ***each of the defendant employer's articulated reasons*** is pretextual."  *Chapman*, 229 F.3d at 1024-25 (emphasis added).[23]

As described in detail *supra*, defendant's evidence is that it terminated King's employment because of her falsification of WIC Program records, her acts and omissions with respect to the missing drug book, and other performance and patient care issues.  Plaintiff's efforts to demonstrate pretext fall short in each of these areas.

With respect to the WIC Program, ADPH's evidence is that it fired King for falsifying SNE documentation.  This falsification had at least three components, to-wit: (a) King certified that she had provided SNE to program participants on occasions when she had not even been on-site, such that participants had simply been handed pamphlets for SNE credit, in contravention of written ADPH policies; (b) King recorded (or caused to be recorded) the same people as receiving SNEs multiple times on the same day, effectively double-counting them by listing them as both individual visits and classes; and (c) when confronted about these discrepancies, King surreptitiously altered ADPH records after the fact to delete most of those individuals from the class.  Plaintiff contends that this proffered justification is pretextual because ADPH singled out King for punishment when "the same rules applied to all staff" and plaintiff's evidence was that Johnson (the Area Nutrition Director) had informed staff at another clinic (albeit not the

---

[22]  *See also Rioux*, 520 F.3d at 1278 ("The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons for its action sufficient for a reasonable factfinder to disbelieve the reasons."); *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (to demonstrate pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence").

[23]  In this Circuit, there is a "well-established rule that a plaintiff must show pretext as to each proffered reason."  *Chapman*, 229 F.3d at 1037 n.30; *see also Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1309 (11th Cir. 2007) ("By failing to rebut each of the legitimate, nondiscriminatory reasons of the City, Crawford has failed to raise a genuine issue of material fact about whether those reasons were pretext for discrimination."); *Bojd v. Golder Associates, Inc.*, 2006 WL 3780645, *1 (11th Cir. Dec. 26, 2006) ("Where multiple reasons are advanced, the plaintiff must show that each reason was a pretext.").

Conecuh clinic) that it was okay to hand out pamphlets and count that activity as an SNE. (Doc. 53, at 10-11.)

Plaintiff's pretext argument is unavailing. As a threshold matter, it is uncontroverted that Johnson discovered the WIC problems at the Conecuh clinic and reported them to ADPH as violations of policy. Inherent in King's pretext argument is the notion that Johnson herself must have been retaliating against King by reporting her violations to ADPH officials (whereas she was not reporting other clinics or other people for similar transgressions). But the record is devoid of evidence that Johnson was aware of King's protected activity. It goes without saying that Johnson could not have been retaliating against King for engaging in protected activity that Johnson never knew had occurred. *See generally Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (to prevail on retaliation claim, "the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.") (citations omitted). Furthermore, even accepting as true plaintiff's evidence that staff at a different ADPH clinic had been told years ago that it was acceptable to record SNE credit where only a pamphlet was handed out, that statement does not exonerate King because (i) her testimony was clear that no one had ever told her it was acceptable to proceed in that fashion, (ii) ADPH's written policies were to the contrary, and (iii) such evidence would in no way explain or excuse King's acts of double-counting SNE credit for the same participants on the same day by listing them as both individual visits and classes, of altering clinic computer records after she was questioned about it, or of ignoring Johnson's follow-up inquiries. Nor has King ever disputed that she in fact did these things, or that as WIC Coordinator she (and not other staff) was the employee responsible for administering the program properly at the Conecuh clinic.

King's pretext argument hinges on the notion that ADPH's decision to terminate her for violating agency policy, misrepresenting SNE credits, double-counting attendees, altering records when a supervisor discovered the double-counting, and failing to follow up when ADPH sought to investigate further were pretextual because someone (not King) at another clinic (not the Conecuh clinic) had ostensibly been informed years earlier that it was okay to hand out literature in lieu of proper SNE training. This does not constitute the sort of implausibility or inconsistency that is required for King to sustain her burden of showing pretext. Simply put, King's argument glosses over several facets of the problem (*i.e.*, the double-counting, alteration

of records, and failure to follow up) and there is absolutely no indication that the ADPH supervisor who spotted and reported King's WIC Program violations had any idea that she had engaged in protected activity.

With respect to the Drug Control Inventory Book, King does not dispute that (a) she was responsible for the book's custody and control at all times; (b) the book went missing; (c) King was aware that the book was missing, but failed to report it or to make any inquiries as to its whereabouts for a period of weeks; and (d) rather than preparing a proper recreation of the book using readily available log forms, King enlisted the aid of a janitor or housekeeper to scrawl the names and quantities of drugs on hand. Defendant presents evidence that it fired King because this course of conduct demonstrates lack of responsibility and poor judgment on her part as to a critically important clinic record. According to defendant's evidence, drug stock records must be properly kept because failure to track and account for pharmaceuticals could violate federal guidelines, trigger adverse audit findings, and jeopardize funding for federal programs in which ADPH participates.

In an effort to undercut this nonretaliatory justification for her dismissal, King suggests that it was not her fault that the book was lost, that the book was not important because the drugs stored at the clinic are not the sort of pharmaceuticals that are typically traded illegally, and that she was merely being resourceful and restoring order to the clinic by preparing the replacement list. This kind of quibbling and second-guessing is manifestly inadequate to constitute pretext. *See, e.g., Rioux*, 520 F.3d at 1278 ("It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive, but rather to demonstrate there is a genuine issue of material fact that the employer's proffered reason … was pretextual."); *Wilson*, 376 F.3d at 1088 ("If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it. … Quarreling with that reason is not sufficient."). Whether King actually lost the book, whether she thought the book was important, or whether the drugs in question are commonly abused on the streets is beside the point. It is undisputed that the ADPH viewed the drug book as vitally important from both an internal protocol and external guidelines standpoint, that King bore sole responsibility for the safekeeping of the book at the Conecuh clinic, that King knew it was lost but did not tell anyone for at least several weeks thereafter, and that King went about replacing the missing tome in a manner that ADPH viewed as grossly inadequate. On this record, a reasonable factfinder could not conclude that

defendant's drug book explanation for King's termination was unworthy of credence; therefore, plaintiff has failed to show pretext as to it.

As to the other performance issues identified as a basis for her termination, it is undisputed that ADPH performed an audit of the Conecuh clinic in May 2008 in which "a large number of errors" were discovered with King's work, including multiple circumstances in which she was effectively practicing medicine without a license. King's pretext argument is apparently that no clinic is perfect, that her nursing mistakes were fairly minor because they did not injure or kill any patient, and that there was no criticism of her nursing and administrative performance prior to the March 31 e-mail. In so arguing, however, King ignores her own correspondence wherein she admitted that ADPH officials had discussed a litany of performance and operational concerns with her on March 28, 2008, three days before she complained of discrimination. King admitted that at the March 28 meeting, her supervisors counseled her for lack of organization of the reception area, a complaint that King had refused to see patients for an immunization appointment a few days earlier, problems with King's attendance and whereabouts during normal business hours, at least two other specific patient complaints about King, the front door of the clinic being locked during business hours, and the supervisors' assessment that things had not been going well at the clinic for a year. Those issues were under investigation before King's protected activity ever happened. Because it is undisputed that ADPH presented all of these concerns to King before she engaged in protected activity, her pretext argument rests on a counterfactual premise that she enjoyed a spotless record with nary a critical word from ADPH prior to the March 31 e-mail. The fact of the matter is that ADPH officials raised serious concerns about King's performance before her protected activity, and the subsequent investigation and disciplinary action had a sturdy factual foundation in pre-March 31 events.[24]

Also, although King lambasts the May 2008 audit as a fishing expedition, defendant's evidence shows that King's course of conduct (*i.e.*, the poor performance of the Conecuh clinic, her attendance and organizational issues, her patient service issues, the WIC Program problems

---

[24] Of course, an employee cannot manipulate Title VII to shield herself from forthcoming adverse action by voicing a complaint of discrimination. *See Alvarez*, 610 F.3d at 1270 ("We emphasize that Title VII's anti-retaliation provisions do not allow employees who are already on thin ice to insulate themselves against termination or discipline by preemptively making a discrimination complaint.").

as to SNE requirements, the loss of the drug book and King's reaction to same, her perceived lying to ADPH officials about skipping a patient appointment to teach a breastfeeding class that never happened, etc.) had so badly eroded ADPH's confidence in her that her supervisors felt it necessary to expand their investigation. Despite casting aspersions on defendant's motivations and belittling the severity and significance of her transgressions, King has failed to come forward with evidence that might create a genuine issue of material fact as to whether ADPH's stated concerns about her performance as a Nurse Coordinator were a pretext for unlawful retaliation. For the most part, she does not deny that she engaged in that conduct, but instead quibbles with ADPH's assessment that it warranted dismissal. She identifies no comparators or written policies casting doubt on the veracity of ADPH's explanation, but instead second-guesses its business judgment. In the context of a *McDonnell Douglas* pretext analysis, that is not enough. *See Alvarez*, 610 F.3d at 1266 ("it is not our role to second-guess the wisdom of an employer's business decisions – indeed the wisdom of them is irrelevant – as long as those decisions were not made with a discriminatory motive"). Simply put, there is no reason to think that ADPH did not actually believe that King's performance was unacceptable and that her termination was warranted on that basis. *See id.* ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision maker's head. … The question is whether her employers were dissatisfied with her for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints … as cover for discriminating against her ….").

A pair of other pretext arguments by King warrant brief treatment here.[25] First, King suggests that an inference of pretext is raised by Thomasson's admission that she was "upset" by

---

[25] Defendant's principal brief addresses an anticipated argument by King that a post-discharge increase in staffing at the Conecuh clinic is evidence of pretext. However, review of King's summary judgment brief reveals that she has not advanced such an argument. (Doc. 53, at 10-15.) Plaintiff having invoked no staffing-related pretext argument, the Court will not *sua sponte* investigate it here. That said, any suggestion that ADPH's alleged increase in staffing at the Conecuh clinic following King's dismissal is probative of pretext would fail. There is no indication, and no reason to believe, that ADPH altered staffing levels at the Conecuh clinic in any way following King's March 31 protected activity. Because staffing levels were identical at the clinic both before and after the protected activity, it is difficult to conceive of how post-termination changes in staffing (even if they occurred) could logically be deemed to demonstrate pretext. In any event, King has not advanced any such argument on summary judgment.

King's March 31 e-mail and called her immediately to confirm what King was alleging. This is far too slender a reed to support plaintiff's burden of establishing pretext. There is a vast inferential leap between evidence that Thomasson was "upset" that plaintiff had accused her of plotting methodically to eradicate all black personnel from the Conecuh clinic, on the one hand, and a conclusion that Thomasson retaliated against King for making that accusation, on the other. Plaintiff offers nothing other than her own speculation and innuendo to bridge that gaping chasm.[26] Second, King indicates that Dianna Tanton and Katina Findley are similarly situated ADPH nurses who were not disciplined or fired for their conduct. But the undisputed evidence shows that Tanton and Findley's errors were vastly different in character from King's, that they were separated temporally from King's performance problems by nearly a decade, and that they were not subject to the same decisionmaker as King.[27] As such, ADPH's treatment of Tanton and Findley does not raise any inference of pretext here because they are not similarly situated to King in a meaningful way.

In sum, viewing the record in the light most favorable to plaintiff, the Court finds that she has failed to meet her burden of showing genuine issues of fact as to whether ADPH's stated reasons for firing King were true, and whether retaliation as the real reason. King was in charge of day-to-day operations at the Conecuh clinic. The record unequivocally shows that ADPH confronted King for operational, administrative and performance failings at the clinic before her protected activity, and that King later falsified federal program records, failed to take proper

---

[26] If a plaintiff could satisfy her *McDonnell Douglas* pretext burden merely by showing that the supervisor accused of unlawful discrimination was unhappy at being called a racist, sexist, or so on, then summary judgment motions in Title VII retaliation cases could never succeed. Human nature being what it is, it is difficult to envision any supervisor not being hurt or upset when a subordinate levels allegations of unlawful discrimination against her. What matters is not whether the alleged discriminator had an emotional response to the accusation, but whether there are genuine issues of fact as to whether that person acted on those emotions in a retaliatory manner. There is no evidence of the latter here.

[27] Specifically, the record shows that Tanton and Findley were nurse coordinators who failed to follow up on abnormal lab results for multiple patients in 1999. (Underwood Second Supp. Aff., ¶¶ 2-3.) Both were reprimanded. (*Id.*) Neither was supervised by Thomasson. (*Id.*) And ADPH did not regard Tanton and Findley's errors as approaching the frequency, breadth, and severity of King's infractions, as documented *supra*. (*Id.*) As such, plaintiff's references to Tanton and Findley are ineffectual in bolstering her pretext argument.

action when a drug inventory control book entrusted to her went missing, misstated her whereabouts to her supervisors, and otherwise irreparably damaged their trust and confidence in her ability to serve as Nurse Coordinator for the Conecuh clinic.  Plaintiff having failed to show pretext for any of these reasons (much less all of them), defendant is entitled to summary judgment on King's retaliation claim.

### C.  *Race Discrimination Cause of Action.*

As noted *supra*, the Complaint expressly alleges that ADPH "has engaged in unlawful racial discrimination in employment."  (Doc. 1, at 4.)  Defendant has also moved for summary judgment on the race discrimination claim on a variety of grounds.  King's extensive briefing in response to that motion neither addresses those arguments nor even alludes to the presence of a race discrimination cause of action in this litigation.  Plaintiff has been completely silent as to ADPH's request for summary judgment on the race discrimination claim.

ADPH asserts that King's omission of any discussion of her race discrimination claim on summary judgment constitutes abandonment.  However, it is well-settled that summary judgment is not automatically granted by virtue of a nonmovant's silence.  *See U.S. v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004) ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of the motion … [and] ensure that the motion itself is supported by evidentiary materials.").[28]  Nonetheless, a court is not obligated to read minds or to construct arguments or theories of relief that counsel have failed to raise and that are not reasonably presented on the face of the pleadings.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on

---

[28]      *See also*, *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2nd Cir. 2004) ("Although the failure to respond may allow the district court to accept the movant's factual assertions as true ..., the moving party must still establish that the undisputed facts entitle him to a judgment as a matter of law"); *Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) ("the court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment").

summary judgment.").[29]  Clearly, "the onus is upon the parties to formulate arguments."  *Id.*
Accordingly, King's decision not to proffer argument, evidence or authority in response to the
race discrimination component of the Motion is at her peril.

As required by the Eleventh Circuit, the undersigned has "review[ed] all of the
evidentiary materials submitted in support of the motion for summary judgment" as to the race
discrimination claim.  *One Piece of Real Property*, 363 F.3d at 1101-02.  Based on that review,
the Court agrees with ADPH that King has failed to establish a *prima facie* case of race
discrimination.  "*McDonnell Douglas* requires the plaintiff to establish a *prima facie* case which
includes identifying an individual who replaced him or was treated better than he was who was
not a member of his protected class."  *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th
Cir. 2005).  The applicable legal standard for this element is as follows: "Where the racial
discrimination is alleged in the application of work rules to discipline an employee, and where
there is no claim that the employee did not violate the work rules, as here, then plaintiff must
show that he engaged in misconduct similar to that of a person outside the protected class, and ...
the disciplinary measures enforced against him were more severe than those enforced against the
other persons who engaged in similar misconduct."  *Rioux*, 520 F.3d at 1276 (internal quotes
omitted).  To satisfy this threshold, "[t]he quantity and quality of the comparator's misconduct
[must] be nearly identical" to that of the plaintiff.  *Id.* at 280 (internal quotes omitted); *see also
Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (to satisfy *prima facie*
case, "[t]he comparators for the fourth prong must be similarly situated in all relevant respects")
(citation omitted).  Plaintiff has identified no facts which might satisfy the comparator element of
her *prima facie* case.  Even if she had, her race discrimination claim would fail for lack of proof
of pretext, for the same reasons previously discussed with respect to the retaliation claim.

---

[29]      *See also Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 142 (3rd Cir. 2001)
("The ruling on a motion for summary judgment is to be made on the record the parties have
actually presented, not on one potentially possible."); *Higgins v. New Balance Athletic Shoe,
Inc.*, 194 F.3d 252, 260 (1st Cir. 1999) (declaring that a "party who aspires to oppose a summary
judgment motion must spell out his arguments squarely and distinctly, or else forever hold his
peace," as district court may ignore arguments not adequately developed by nonmovant).

Accordingly, after reviewing defendant's Rule 56 motion on the merits, the Court is of the opinion that ADPH is entitled to entry of summary judgment in its favor on plaintiff's race discrimination cause of action.

**V.     Conclusion.**

For all of the foregoing reasons, it is hereby **ordered** as follows:

1.     Defendant's Motion to Exceed Page Limit (doc. 42) is **granted**;

2.     Defendant's Motions to Strike (docs. 55 & 56) are **granted in part**, as set forth in footnotes 8, 10 and 18, but are otherwise **moot** because the objected-to matters addressed therein are not necessary to full adjudication of the summary judgment motion;

3.     Defendant's Motion for Summary Judgment (doc. 43) is **granted**, and this action is **dismissed with prejudice**; and

4.     A separate judgment will enter.

DONE and ORDERED this 2nd day of September, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE